

# NUMBER 13-10-00300-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ALAMO COUNTRY CLUB OWNERS ASSOCIATION,
MELVIN STAPLES, INDIVIDUALLY AND AS
ALAMO COUNTRY CLUB OWNERS ASSOCIATION
BOARD MEMBER,                                          Appellants,

v.

JAMES SHELTON,                                          Appellee.

## On appeal from the 389th District Court
## of Hidalgo County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Benavides
### Memorandum Opinion by Chief Justice Valdez

By seven issues, consisting of 21 sub-issues, appellants, Alamo Country Club

Owners Association (ACCOA) and Melvin Staples, appeal from a final judgment in favor

of appellee, James Shelton.  We reverse and render in part and affirm in part.

## I. BACKGROUND

In 1995, Shelton and his wife Cheryl purchased Lot #260 located at 332 Diana Drive in Alamo, Texas.[1]  Lot #260 is located in Alamo Country Club (ACC), an "over-55" community.  The Declaration of Covenants, Conditions, and Restrictions of Record states that every person who acquires title, legal or equitable, to any lot in the subdivision shall thereby become a member of ACCOA.  Membership entitles owners to use the amenities at ACC, which include a championship golf course, driving range, putting green, lighted tennis courts, heated swimming pool, clubhouse and pro shop, shuffleboard, picnic areas, and bicycle and jogging trails.  If a member leases a residence in ACC, the lessee is entitled to use the amenities.  Under such circumstances, "[t]he member relinquishes all rights to use the various facilities for the duration of the rental period."

In February 1998, Shelton signed a warranty deed, conveying lot #260 to Dale Winter for $93,000.  The deed states that it "does not include the voting rights or the common ground rights or values.  These rights and values will be retained by James E. Shelton."  Mrs. Shelton did not sign the deed, but she was aware of it.  Winter began paying property taxes in 1998, but did not live on the property.  The Sheltons continued to live in the home, and they continued to pay the ACC assessments.  Winter continued to reside in his home in McAllen.

In late 2003, a member of ACCOA discovered Shelton's deed to Winter.  ACCOA manager Sandra Moravitz and ACCOA president Melvin Staples were informed of the discovery and consulted with ACCOA's attorney, Mark Walker, about the deed.  Walker

---

[1] The Sheltons also owned a home on Kiwi Street in McAllen, Texas, the deed to which is in the name of Cheryl Shelton only.  Their daughter and son-in-law use the home as their residence.  The Sheltons' driver's licenses gave the Kiwi street address as their residence.

believed that ownership had changed. Walker did not believe Shelton's reservation in the deed was valid.

On February 10, 2004, Moravitz wrote Winter, stating that she had learned he was the legal owner of Lot #260 and he must provide proof of being over age 55. In order to find out Shelton's status, she enclosed a renter's form to verify a lease. The letter was sent to Winter at his McAllen residence. Winter called Shelton about the letter, but the Sheltons took no action in response.

In April 2004, Moravitz wrote a follow-up letter to Winter, asking again for the same information. Again, the letter was sent to Winter at his McAllen residence. Winter did not respond.

In June 2004, the Sheltons went on a long vacation to Colorado, and Winter moved into their house in the ACC. At this time, Winter provided proof of his age and began paying the monthly assessment, but he gave no information about Shelton or the renter's forms. Staples and Moravitz heard rumors from members that the Sheltons had moved out, but Shelton was still playing golf at the ACC golf course.

On October 8, 2004, Winter sent Staples a letter stating that he was the resident at lot #260, he had executed a power of attorney in favor of Shelton, and "[a]s everyone knows James Shelton and Cheryl Shelton have been residents in Alamo Country club for the past 10+ years."

On October 11, 2004, Walker delivered a letter to Winter at his office and left a copy for Shelton at the Kiwi street address. The letter advised Winter and Shelton that: (1) Shelton has no rights as a member or owner under the power of attorney or under the reservation in the deed; (2) Winter was the only resident at Lot #260; (3) Shelton

3

had failed to fill out forms showing how or why he resided there; (4) Winter had refused to confirm Shelton was a guest; and (5) it no longer appeared that Shelton owned a home or resided at ACC. Walker asked that Winter or Shelton provide proof that Shelton resided there or was a guest. Otherwise, Shelton would be allowed to play golf only as a guest upon payment of the fees and only when accompanied by a member. If he did not do so and attempted to play golf, the police would be called and he would be reported as a trespasser.

On the morning of October 12, 2004, Shelton went to the ACC pro shop, identified himself to the clerk, informed her that he lived at Lot #260, and stated that he was there to play golf. Staples appeared and attempted to give Shelton a second copy of Walker's letter, which Shelton refused to accept. Shelton told Staples he would abide by the rules and was going to play golf. Staples asked Shelton to discuss the matter, but he refused and left for the tee. Staples asked Charles Wilmoth, another ACC member, to sponsor Shelton as a guest, but Wilmoth refused.

Staples then asked Moravitz to call the police because he thought Shelton was a trespasser. Shelton told Staples he did not care if he called the police and offered Staples his cell phone to make the call.

Officer Jose Rodriguez of the Alamo Police Department responded to the call. Staples and Moravitz pointed out Shelton as a trespasser. They informed Officer Rodriguez that Shelton had been warned by Walker's letter not to be there, had refused to accept a second copy of the letter, had caused problems for years, and now refused to leave. Moravitz told Officer Rodriguez that Shelton was not an ACC owner and had

4

no right to be there. Staples told Officer Rodriguez that they wanted Shelton removed from the golf course.

Officer Rodriguez asked Shelton to leave the golf course, but Shelton refused. Officer Rodriguez asked again, and again, Shelton refused. Then, Officer Rodriguez told Shelton that charges would be filed if he did not leave and he would be taken to the police station. Shelton refused to leave. At this point, Officer Rodriguez asked Staples to sign a complaint form to press charges, which he did, and Shelton was then arrested and escorted off the golf course to Officer Rodriguez's police cruiser. Shelton was transported to the police station, where he was booked for trespass and put into a holding cell. Shelton was released that afternoon. Later that day, the police called Moravitz to advise that this was a civil matter and that the police would not do anything without a temporary restraining order. A few days later, the police investigator suspended the case "due to insufficient probable cause."

On October 14, 2004, ACCOA sued Shelton for declaratory and injunctive relief and for damages for trespass, quantum meruit, unjust enrichment, and fraud. On October 26, 2004, Winter signed a deed conveying Lot #260 to himself and Shelton. On November 8, 2004, Shelton countersued ACCOA for breach of contract and declaratory relief. ACCOA's claims were nonsuited in August 2008. Shelton later sued Staples as a third-party defendant and asserted claims against ACCOA and Staples ("appellants") for false imprisonment and malicious prosecution.

A jury trial was held, and a verdict was reached in favor of Shelton on his claims against appellants for breach of contract, false imprisonment, and malicious prosecution. The jury awarded Shelton $500 on his breach of contract claim and

5

attorney's fees in the amount of $95,000. On his claims for false imprisonment and malicious prosecution, the jury awarded Shelton $200,000 for physical pain and mental anguish, $1,500 for disfigurement, and $1,950 for medical care expenses. In addition, the jury awarded Shelton punitive damages in the amount of $600,000. The trial court reduced the punitive damages award to $201,500. This appeal ensued.

## II. MALICIOUS PROSECUTION

In their first issue, which consists of six sub-issues, appellants argue the following: (1) question 3 of the jury charge failed to properly submit the elements of malicious prosecution; (2) the evidence is insufficient to support a finding of malicious prosecution; and (3) Shelton's claim for malicious prosecution is barred by the statute of limitations.

### A. Jury Charge Error

In their first sub-issue, appellants argue that the jury charge failed to instruct the jury on the correct meaning of "procure" or "initiate" a criminal proceeding.

#### 1. Applicable Law

It is fundamental to our system of justice that parties have the right to be judged by a jury properly instructed in the law. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000). Accordingly, the trial court is required to submit such instructions and definitions as shall be proper to enable the jury to render a verdict. *See* TEX. R. CIV. P. 277. "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002) (citing TEX. R. CIV. P. 278).

A plaintiff in a malicious criminal prosecution claim must establish seven elements: (1) the commencement of a criminal prosecution against the plaintiff; (2) causation (initiation or procurement) of the action by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the absence of probable cause for the proceedings; (6) malice in filing the charge; and (7) damage to the plaintiff. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex. 2007).

### 2. Standard of Review

When the content of a trial court's definition is challenged as legally incorrect, our standard of review is de novo. *See Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 221 (Tex. 2010) (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex. 2002)).

### 3. Discussion

In sub-issue one, which is composed of four sub-parts, appellants argue that the trial court erred by submitting a jury charge that failed to: (a) instruct the jury that a prosecution is "initiated" by filing a formal charge with law enforcement authorities; (b) instruct the jury that a prosecution is "procured" by intentionally providing information to the police officer that they knew was false; (c) instruct the jury that a person does not "procure" a criminal prosecution if the decision was left to the discretion of another; and (d) properly define what it means to "initiate" or "procure" a prosecution.

With regard to sub-part (a), Shelton points out that the jury question on malicious prosecution was submitted verbatim from the Texas Pattern Jury Charge, which is based on the seven elements for malicious prosecution articulated in *Richey*. *See Richey*, 952 S.W.2d at 517. According to Shelton, it was not necessary for the jury charge to define "initiate," as the Texas Supreme Court explained in *Lieck*, because "it

7

would be demonstrated by evidence that defendant filed formal charges against plaintiff." *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 293 (Tex. 1994).

Based on *Lieck*, we conclude that the trial court did not commit error by failing to define "initiate," because the evidence demonstrated that appellants "signed a complaint form and provided an affidavit" and that "[t]hey filed charges and they signed a complaint" against Shelton. *See id.* Accordingly, sub-part (a) is overruled.

With regard to sub-part (b), Shelton contends that appellants waived any complaint about the alleged failure to provide a definition for "procure" by failing to submit a substantially correct definition or instruction. The rules of civil procedure state, "Failure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment." TEX. R. CIV. P. 278.

Appellants concede that the definition for "procure" that they tendered to the trial court did not track the definition set forth in *Lieck*. *See Lieck*, 881 S.W.2d at 293. However, appellants argue that Shelton has failed to "identify any important deviation."

Appellants requested the following instruction: "[Appellants] did not procure a criminal prosecution if the decision whether to prosecute was left to the discretion of another, including a law enforcement official or the grand jury, unless [appellants] provided information which [they] knew was false." In *Lieck*, the Texas Supreme Court explained that in cases involving a claim for malicious prosecution, procurement should be defined as follows:

> A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another,

8

including a law enforcement official or the grand jury, unless the person provides information which he knows is false. A criminal prosecution may be procured by more than one person.

*Id.*

The definition proposed by appellants consisted of only one of the three sentences that make up the definition of procurement articulated in *Lieck. Id.* It is not, in our view, a substantially correct definition. *See* TEX. R. CIV. P. 278. Accordingly, sub-part (b) is overruled.

With regard to sub-part (c), Shelton also contends that appellants waived any complaint about the alleged failure to provide a definition for "procure" by failing to submit a substantially correct definition or instruction. We agree. Again, we note that the definition proposed by appellants consisted of only one of the three sentences that make up the definition of procurement articulated in *Lieck. See Lieck*, 881 S.W.2d at 293. One-third of a correct definition is not, in our view, a substantially correct definition. *See* TEX. R. CIV. P. 278. Accordingly, sub-part (c) is overruled.

In sub-part (d), appellants argue, in the alternative to sub-parts (a)-(c), that question 3 of the jury charge was defective because it did not properly define what it means to "initiate" or "procure" a prosecution. In overruling sub-part (a), we explained that, based on *Lieck*, the trial court did not commit error by failing to define "initiate," because the evidence demonstrated that appellants "signed a complaint form and provided an affidavit" to press charges against Shelton. *See Lieck*, 881 S.W.2d at 293. Moreover, in overruling sub-parts (b)-(c), we explained that, in light of appellants' failure to tender a substantially correct definition of "procure," the trial court's failure to submit a definition or instruction on "procure" cannot be deemed a ground for reversal of the

9

judgment. *See* TEX. R. CIV. P. 278. Accordingly, sub-part (d) is overruled for the same reasons.

**B.     Sufficiency of the Evidence**

In sub-issues two through six, appellants challenge the legal and factual sufficiency of the evidence with regard to the jury's verdict on malicious prosecution.

*1. Standard of Review*

a) Legal Sufficiency

The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We review the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable fact-finder could and disregarding any contrary evidence unless a reasonable fact-finder could not. *Id.* at 821-22, 827.

b) Factual Sufficiency

When considering a factual sufficiency challenge to a jury's verdict, courts of appeals must consider and weigh all of the evidence, not just that evidence which supports the verdict. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998). A court of appeals can set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Id.* at 407. When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).

### 2. Probable Cause

In sub-issue two, appellants argue that the evidence is insufficient to prove that they lacked probable cause to believe Shelton was trespassing.

#### a) Applicable Law

The Texas Supreme Court has defined probable cause as "the existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor [complainant], that the person charged was guilty of the crime for which he was prosecuted." *Richey*, 952 S.W.2d at 517 (citing *Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983)). The probable-cause determination asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted. *Id.* (citing *Akin*, 661 S.W.2d at 920-21).

"Malicious prosecution actions involve a delicate balance between society's interest in the efficient enforcement of the criminal law and the individual's interest in freedom from unjustifiable and oppressive criminal prosecution." *Id.* (citing *Lieck*, 881 S.W.2d at 290-91). "Accordingly, there is an initial presumption in malicious prosecution actions that the defendant acted reasonably and in good faith and had probable cause to initiate the proceedings." *Id.* (citing *Ellis County State Bank v. Keever*, 888 S.W.2d 790, 794 (Tex. 1994)). "That presumption disappears once a plaintiff produces evidence that the motives, grounds, beliefs, and other evidence upon which the defendant acted did not constitute probable cause." *Id.* at 518 (citing *Keever*, 888 S.W.2d at 794). "The burden then shifts to the defendant to offer proof of probable cause." *Id.* (citing *Keever*, 888 S.W.2d at 794).

"Whether probable cause is a question of law or a mixed question of law and fact depends on whether the parties dispute the underlying facts." *Id.* "When the facts underlying the defendant's decision to prosecute are disputed, the trier of fact must weigh evidence and resolve conflicts to determine if probable cause exists, as a mixed question of law and fact." *Id.* (citing *Akin*, 661 S.W.2d at 920). "It has long been true, however, that 'when the facts are not contested, and there is no conflict in the evidence directed to that issue, the question of probable cause is a question of law which is to be decided by the court.'" *Id.* (quoting *Ramsey v. Arrott*, 64 Tex. 320, 323 (1885) (citing *Landa v. Obert*, 45 Tex. 539, 543 (1876) ("what facts and circumstances amount to probable cause is a pure question of law"))).

b) Discussion

Appellants argue that the facts known to them supported the objective elements of trespass under section 30.05(a) of the Texas Penal Code, which provides:

> A person commits an offense if the person enters or remains on or in property of another, including residential land, agricultural land, a recreational vehicle park, a building, or an aircraft or other vehicle, without effective consent and the person:
>
> (1) had notice that the entry was forbidden; or
>
> (2) received notice to depart but failed to do so.

TEX. PENAL CODE ANN. § 30.05(a) (West Supp. 2011).

According to appellants, the evidence showed that they knew: (1) Shelton had conveyed his lot to Winter who claimed to be the 100% owner; (2) owners complained that Shelton had moved but was still golfing on the ACC golf course; (3) Winter was paying the taxes and assessments; (4) Shelton and Winter gave no explanation that

12

would authorize Shelton to use the golf course; (5) Shelton refused to discuss or explain why he thought he could use the facilities; (6) Shelton had been warned that if he appeared and could not explain his status, the police would be summoned; and (7) Shelton refused to comply with the officer's requests to leave. In addition, appellants relied on attorney Walker's conclusion that the reservation in Shelton's deed and the purported power of attorney were invalid. Appellants argue that it was "entirely reasonable to rely on counsel in this area."

According to Shelton, the evidence established that appellants could not have reasonably and honestly believed that he was a trespasser because the evidence showed that they knew: (1) he had purchased a home at ACC in 1995; (2) Staples never personally saw Shelton move out of ACC; (3) Staples admitted that he knew Shelton was living at ACC; (4) Staples knew that Mrs. Shelton had not conveyed away her interest in the property at ACC, and that as an owner, Mrs. Shelton and her spouse, Shelton, were entitled to full use of ACC amenities including the golf course; (5) Staples had Winter's letter dated October 8, 2004, that said Shelton was residing at ACC as he had been for the prior ten years; (6) appellant Staples never spoke with Shelton about where he was living; (7) Staples never knocked on Shelton's door at ACC to see if he was there; (8) Staples agreed based upon documents he has now seen that Shelton was not a trespasser on the day of arrest; (9) ACCOA Rules require that three infraction letters be sent before legal action is taken, and none were sent to Shelton; (10) Staples did not investigate where Shelton lived; and (11) Staples knew that golf was very important to Shelton, and that he played every day.

Shelton points out that a defendant's motives, grounds, beliefs, or other information upon which the defendant acted will support lack of probable cause. *See Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) ("To rebut this presumption, the plaintiff must produce evidence that the motives, grounds, beliefs, or other information upon which the defendant acted did not constitute probable cause."). According to Shelton, Staples "disliked [him] from the very first day he met him in April 2001." "[Staples's] very first act as president was to have Moravitz write a letter to Winter about Shelton's residency status."

Finally, Shelton notes that, to the extent appellants are attempting to rely upon advice of counsel as a defense, they failed to plead advice of counsel as an affirmative defense and it is therefore waived. Furthermore, Shelton argues, "[t]here was no jury instruction requested or given that advice of counsel supported lack of probable cause." Moreover, Shelton argues, "Staples approved the October 11, 2004 threatening letter written by ACCOA's lawyer addressed to Winter and Shelton, which stated that if Shelton played golf he would be reported to the police as a trespasser." According to Shelton, "ACCOA's attorney's time records show that he did not provide any legal advice on ownership or perform any type of title search prior to the arrest." Shelton states, "He was not asked to do either."

Appellants disagree, arguing that "Shelton's glaring problem is that in 2009[2] he, his wife, and Winter all believed that his deed to Winter was valid and Winter owned 100% of the lot. If the Sheltons did not own the lot, they could not be members."

With respect to the contention that Staples knew Shelton was residing at ACC, appellants argue that mere residency did not give him a right to use the amenities.

---

[2] "2009" appears to be a typographical error, the intended year of reference being 2004.

14

According to appellants, Shelton "needed to establish some other basis, e.g., he was a renter, etc." Moreover, appellants argue that Staples had reason to believe the Sheltons no longer resided there. The Sheltons left the house for an extended period; other owners told Moravitz and Staples that the Sheltons moved out when Winter moved in.

With respect to the contention that because Staples knew Mrs. Shelton had not signed the deed to Winter and therefore knew she remained an owner, thus entitling Shelton to use the amenities as her spouse, appellants argue that Staples did not know the legal effect of her failure to sign because he knew nothing about community property law. According to appellants, in 2004, Staples "did not know if that meant she continued to legally own the lot or if the deed might be void."

With respect to Shelton's contention that Staples agreed that based on documents Staples later saw, Shelton was not a trespasser, appellants argue that Shelton is incorrect. According to appellants, "[Staples] said that if Mrs. Shelton had retained her interest in the lot and the trial court finds the documents true, then Shelton was not a trespasser." In any event, appellants argue, "[l]ater events and knowledge are not material to what [appellants] knew or believed in 2004; probable cause is determined only by the events prior to instituting any criminal proceedings."

Finally, with respect to the advice of counsel, appellants argue that Shelton "cites no authority that it is an affirmative defense that must be pled or requires a jury finding." Appellants point out that the evidence was admitted without objection. Appellants argue that Shelton is incorrect in asserting that Walker did not advise appellants about ownership. According to appellants, Walker prepared a memorandum for Staples and

15

Moravitz in January 2004, advising them about the deed. Furthermore, before the arrest, Walker obtained Shelton's deed to Winter and the address on Shelton's driver's license, which was the Kiwi Street address in McAllen. In Walker's opinion, the deed transferred ownership from Shelton to Winter and Shelton was therefore trespassing.

It is clear from the foregoing that the jury was presented with sharply conflicting evidence and arguments on the issue of appellants' probable cause for believing Shelton was committing criminal trespass by playing golf on the ACC golf course on the morning of October 12, 2004. The probable-cause determination required the jury to decide (1) the facts that appellants could have "honestly and reasonably believed" to be true before they called the police and (2) whether, given those facts, a reasonable person would believe that a crime had been committed. *See Richey*, 952 S.W.2d at 517. These facts were hotly disputed at trial. Therefore, the jury was required to weigh the evidence and resolve conflicts to make the probable-cause determination. *See id.* at 518. We are reminded that "[j]urors are the sole judges of the credibility of the witnesses and the weight to give their testimony." *City of Keller*, 168 S.W.3d at 819. "They may choose to believe one witness and disbelieve another." *Id.* "Reviewing courts cannot impose their own opinions to the contrary." *Id.*

Under the circumstances of this case, given that the jury was presented with evidence and testimony that sharply conflicted in virtually every material respect, we conclude that the test for legal sufficiency is met because "the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *See Keller*, 168 S.W.3d at 827. Specifically, reasonable and fair-minded people could have concluded from the evidence that appellants did not honestly, or did not reasonably,

16

believe that Shelton was committing criminal trespass before they called the police. We further conclude that the test for factual sufficiency is met because the verdict is not contrary to the overwhelming weight of the evidence such that it is clearly wrong and unjust. *See Ellis*, 971 S.W.2d at 406-07.

Accordingly, sub-issue two is overruled.

### 3. *Initiation of Criminal Prosecution*

In their third sub-issue, appellants argue that the evidence is legally and factually insufficient to prove that a criminal prosecution was initiated against Shelton. According to appellants, prosecution of a misdemeanor offense, such as the offense in this case, begins with the filing of a sworn complaint in justice court or municipal court. *See* TEX. CODE CRIM. PROC. ANN. art. 45.018 (West 2006) ("Complaint"); *id.* art. 45.019 (West 2006) ("Requisites of Complaint"). In relevant part, the Texas Code of Criminal Procedure defines a "complaint" to mean "a sworn allegation charging the accused with the commission of an offense." *See id.* art. 45.018. A complaint must be sworn to before an "officer authorized to administer oaths." *Id.* art. 45.019(d). Appellants argue that a criminal prosecution against Shelton was never initiated because the complaint that Staples signed and delivered to Officer Rodriguez was not sworn to and was never filed in justice court or municipal court. Thus, according to appellants, no criminal prosecution of Shelton was ever "initiated."

The Texas Supreme Court's decision in *Lieck*, which drew extensively from the relevant portions of the Restatement (Second) of Torts, is instructive, if not controlling, for purposes of our analysis with respect to the elements of malicious prosecution. In

17

*Lieck*, the Texas Supreme Court cited with approval the following formulation found in the Restatement:

> A private person who initiates or procures the institution of criminal proceedings against another who is not guilty of the offense charged is subject to liability if (a) he initiates or procures the proceedings without probable cause and primarily for a purpose other than that of bringing an offender to justice; and (b) the proceedings have terminated in favor of the accused.

*Lieck*, 881 S.W.2d at 292 (citing RESTATEMENT (SECOND) OF TORTS § 653).

Section 654 of the Restatement (Second) of Torts defines the term "criminal proceedings" and explains when "criminal proceedings are instituted" for purposes of malicious prosecution:

> (1) The term "criminal proceedings" includes any proceeding in which a government seeks to prosecute a person for an offense and to impose upon him a penalty of a criminal character.
>
> (2) Criminal proceedings are instituted when
>
>> (a) process is issued for the purpose of bringing the person accused of a criminal offense before an official or tribunal whose function is to determine whether he is guilty of the offense charged, or whether he shall be held for later determination of his guilt or innocence; or
>>
>> (b) without the issuance of process an indictment is returned or an information filed against him; or
>>
>> (c) he is lawfully arrested on a criminal charge.

RESTATEMENT (SECOND) OF TORTS § 654 (2012).

Although appellants argue that Shelton's arrest is insufficient to initiate a criminal proceeding, this is not the position taken in the Restatement (Second) of Torts, as comment e to section 654 clarifies:

> Even without the issuance of any process, or indictment or information, criminal proceedings may be instituted by lawful and valid arrest of the

accused on a criminal charge. If the arrest is not a valid one, an action for malicious prosecution will not lie unless some further step is taken, such as bringing the accused before a magistrate for determination whether he is to be held. If there is nothing more than the false arrest and the accused is released without any further proceeding, his remedy is an action for false imprisonment. If the arrest is valid and lawful, false imprisonment will not lie. But the arrest is then an initial step in a criminal proceeding; and if it is made or instigated without probable cause, the remedy is by an action for malicious prosecution.

*Id.* § 654, comment e.

The parties agree that, at the time of Shelton's arrest, Officer Rodriguez told Shelton that he was taking him to the police station because "they filed charges and they signed a complaint." *See Lieck*, 881 S.W.2d at 292 ("A person initiates a criminal prosecution if he makes a formal charge to law enforcement authorities."); *All Am. Tel., Inc. v. USLD Communs., Inc.*, 291 S.W.3d 518, 533 (Tex. App.—Fort Worth 2009, pet. denied) ("A defendant initiates a prosecution when it files formal charges against the plaintiff.").

The specific information given to Officer Rodriguez was that Shelton was trespassing on the golf course and that appellants wanted him removed. Based on this information, Officer Rodriguez believed Shelton was committing an offense in his presence, prompting him to lawfully arrest Shelton without a warrant. *See* TEX. CODE CRIM. PROC. ANN. art. 14.01(b) (West 2005). This constitutes the initiation of a criminal proceeding, as explained in the illustration given in the Restatement (Second) of Torts:

A, maliciously and without probable cause, informs a police officer that B has committed a felony. Acting on this information, the officer makes a valid arrest of B. He then discovers that B is innocent and releases him without any further steps to prosecute him. A is subject to liability to B for malicious prosecution.

RESTATEMENT (SECOND) OF TORTS § 654, comment e, Illustration 1 (2012).

19

We conclude that the test for legal sufficiency is met because "the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *See Keller*, 168 S.W.3d at 827. Specifically, reasonable and fair-minded people could have concluded from the evidence that appellants initiated a criminal prosecution of Shelton. We further conclude that the test for factual sufficiency is met because the verdict is not contrary to the overwhelming weight of the evidence such that it is clearly wrong and unjust. *See Ellis*, 971 S.W.2d at 406-07.

Accordingly, appellants' third sub-issue is overruled.

### 4. Procurement of Prosecution

In sub-issue four, appellants argue that the evidence is insufficient to prove appellants procured prosecution of Shelton. According to appellants, assuming there was a prosecution, they could not have procured it because "the person procures the prosecution by providing information he knows to be false; negligence or failing to provide all information is insufficient."

In *Lieck*, the Texas Supreme Court compared the "initiation" and "procurement" elements of a claim for malicious prosecution to the element of causation for other torts, concluding that the approach taken by the Restatement (Second) of Torts was preferable to traditional principles of common law causation:

> The RESTATEMENT concepts of initiation and procurement are better suited to malicious prosecution cases than the more general idea of causation. In such cases in the future, the jury should be asked, not whether the defendant "caused" criminal proceedings, but whether he either "initiated" or "procured" them, depending on the nature of the case.

*See Lieck*, 881 S.W.2d at 293. In this passage, the Court suggests that the relevant inquiry is disjunctive, rather than conjunctive: whether the defendant either initiated or

20

procured criminal proceedings. *Id.* This is the approach of the Restatement (Second) of Torts, which provides in relevant part: "A private person who initiates or procures the institution of criminal proceedings against another who is not guilty of the offense charged is subject to liability . . . ." RESTATEMENT (SECOND) OF TORTS § 653.

In deciding appellants' third sub-issue, we concluded that the evidence was legally and factually sufficient to support the jury's finding that appellants initiated a criminal proceeding against Shelton. Therefore, it is unnecessary to address appellants' contention that the evidence was legally and factually insufficient to prove that appellants procured criminal proceedings. *See* TEX. R. APP. P. 47.1. Accordingly, appellants' fourth sub-issue is overruled.

### 5. Malice

In their fifth sub-issue, appellants argue that the evidence is legally and factually insufficient to prove appellants acted with malice. According to appellants, "Here, the only actor was Staples and there is no evidence he acted with ill will, evil motive, or gross indifference to the rights of others so as to amount to a willful or wanton act." Appellants argue that Staples "consulted counsel about Shelton's status several times over a period of months . . . [and] [t]he advice of counsel is evidence of lack of malice." Furthermore, according to appellants, "Staples did not ask the officer to arrest Shelton; he submitted a statement only after Shelton demanded it and the officer requested it." Appellants argue that there is no evidence of malice because they "did everything possible to avoid a confrontation."

"Malice may be established by either direct or circumstantial evidence." *Thrift v. Hubbard*, 974 S.W.2d 70, 80 (Tex. App.—San Antonio 1998, pet. denied). "Malice has

been defined as ill will or evil motive, or such gross indifference or reckless disregard for the rights of others as to amount to a knowing, unreasonable, wanton, and willful act." *Luce v. Interstate Adjusters, Inc.*, 26 S.W.3d 561, 566 (Tex. App.—Dallas 2000, no pet.) (citing *Ellis*, 870 S.W.2d at 69). "To establish malice, it is not necessary to prove that the defendant acted with personal spite or ill will; it is sufficient to show the defendant committed wrongful acts in reckless disregard of another's rights and with indifference as to whether the party would be injured." *Id.* "This element of malice may be inferred from a lack of probable cause." *Id.* (citing *Fisher v. Beach*, 671 S.W.2d 63, 67 (Tex. App.—Dallas 1984, no writ)). "However, lack of probable cause may not be inferred from a finding of malice." *Id.* at 566 n. 2.

In *Guernsey Community Federal Credit Union v. Gonzalez*, 539 S.W.2d 896 (Tex. Civ. App.—El Paso 1976, writ ref'd n.r.e.), the El Paso Court of Appeals adopted Dean Prosser's approach to malice in the context of malicious prosecution:

> The defendant's improper purpose usually is proved by circumstantial evidence. The plaintiff must establish malice in addition to the absence of probable cause; but, since there can be no legitimate purpose in a prosecution unless there is an honest belief in the guilt of the accused, it is generally agreed that the lack of probable cause may give rise to an inference of malice, sufficient to carry the question to the jury.

*Id.* at 900 (citing Prosser, LAW OF TORTS, 4th ed., at 848-849); *see also Digby v. Texas Bank*, 943 S.W.2d 914, 922 (Tex. App.—El Paso 1997, writ denied).

We begin by noting that Staples admitted that, from the very first day he met Shelton in April 2001, he did not like him. The evidence presented to the jury at trial established that Staples was not the only actor, however, as appellants argue on appeal. Rather, both Staples and Moravitz participated in the conduct that initiated a criminal proceeding against Shelton. Staples and Moravitz pointed out Shelton as a

22

trespasser. They informed Officer Rodriguez that Shelton had been warned by Walker's letter not to be there, had refused to accept a second copy of the letter, had caused problems for years, and had refused to leave. Moravitz told Officer Rodriguez that Shelton was not an owner and had no right to be there. Staples told Officer Rodriguez that they wanted Shelton removed from the golf course.

Appellants knew Shelton was continuing to assert a right to use the golf course under the reservation clause in his deed to Winter, but they did not disclose this material information to Officer Rodriguez. *See Forbes v. Lanzl*, 9 S.W.3d 895, 899 (Tex. App.— Austin 2000, pet. denied) ("[A] failure to fully and fairly disclose all material information or knowingly providing false information . . . are relevant to the issue[] of malice . . . in a malicious prosecution claim."). Moreover, although Winter's letter advised that "[a]s everyone knows James Shelton and Cheryl Shelton have been residents in Alamo Country club for the past 10+ years," appellants did not inform Officer Rodriguez that Shelton resided at ACC or that they were confused or uncertain about whether Shelton resided at ACC. *See id.*

Finally, in deciding appellant's second sub-issue, we concluded that the evidence was legally and factually sufficient to support the jury's finding that appellants lacked probable cause. *See Luce*, 26 S.W.3d at 566 ("This element of malice may be inferred from a lack of probable cause."); *Gonzalez*, 539 S.W.2d at ("it is generally agreed that the lack of probable cause may give rise to an inference of malice").

Based on the evidence of personal animosity of Staples toward Shelton, appellants' failure to disclose material information to Officer Rodriguez, and the absence of probable cause, we conclude that the test for legal sufficiency is met because "the

23

evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *See Keller*, 168 S.W.3d at 827. Specifically, reasonable and fair-minded people could have concluded from the evidence that appellants acted with malice when they initiated a criminal prosecution of Shelton. We further conclude that the test for factual sufficiency is met because the verdict is not contrary to the overwhelming weight of the evidence such that it is clearly wrong and unjust. *See Ellis*, 971 S.W.2d at 406-07.

Accordingly, appellant's fifth sub-issue is overruled.

### 6. *Statute of Limitations*

In their sixth sub-issue, appellants argue that the evidence established as a matter of law that Shelton's claim for malicious prosecution was barred by the statute of limitations.

Limitations is an affirmative defense, *see* TEX. R. CIV. P. 94, and appellants therefore had the burden to "plead, prove, and secure findings to sustain [their] plea of limitations." *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988). At trial, appellants did not request that the trial court submit their limitations defense to the jury, and they did not object to the trial court's failure to submit the limitations issue. *See Ogu v. C.I.A. Servs.*, No. 01-09-01025-CV, 2011 Tex. App. LEXIS 1979, at *16 n.4 (Tex. App.—Houston [1st Dist.] Mar. 17, 2011, no pet.) (mem. op.) ("[T]he statute of limitations is an affirmative defense that must be pleaded and tried in the trial court or it is waived; it may not be raised for the first time after trial.") (citing *Hollingsworth v. Hollingsworth*, 274 S.W.3d 811, 814-15 (Tex. App.—Dallas 2008, no pet.) (holding that limitations defense is waived when first raised in motion for new trial)). Accordingly,

24

appellants waived the limitations defense. *See Pitts & Collard, L.L.P. v. Schechter*, 01-08-00969-CV, 2011 Tex. App. LEXIS 10214, at *52 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op. on reh'g) ("No issue on limitations was submitted to the jury, and [defendant] did not object to this omission or request that a question on limitations be submitted. He has therefore waived his limitations defense.") (citing *Roberts v. Holmes*, 412 S.W.2d 947, 949 (Tex. Civ. App.—Eastland 1966, no writ) (holding that appellants waived limitations defense by failing to request jury question or object to trial court's failure to submit limitations issue)). Accordingly, appellants' sixth sub-issue is overruled.

We have considered each of the six sub-issues fairly included in appellants' first issue and have overruled each. Accordingly, appellants' first issue is overruled.

### III. FALSE IMPRISONMENT

In appellants' second issue, which consists of two sub-issues, they argue that (1) question 2 failed to properly submit the elements of false imprisonment and (2) Shelton failed to prove its elements.

### A. Jury Charge Error

In their first sub-issue, appellants argue that the jury question failed to instruct the jury that appellants must direct the officer to arrest or knowingly provide false information.

#### 1. Applicable Law

"The essential elements of a cause of action for false imprisonment are: (1) willful detention; (2) without consent; and (3) without authority of law." S*ee Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375 (Tex. 1985).

25

### 2. *Standard of Review*

When the content of a trial court's definition is challenged as legally incorrect, our standard of review is de novo. *See Crump*, 330 S.W.3d at 221.

### 3. *Discussion*

The charge instructed the jury that "'[f]alsely imprison' means to willfully detain another without legal justification, against his consent, whether such detention be affected by violence, by threat, or by any other means that restrains a person from moving from one place to another." The instruction, which tracks the Texas Pattern Jury Charge, includes the essential elements of the offense, as articulated by the Texas Supreme Court in *Castillo*. *Castillo*, 693 S.W.2d at 375. Accordingly, appellants' first sub-issue is overruled.

## B.     Sufficiency of the Evidence

In their second and third sub-issues, appellants argue that the evidence is legally and factually insufficient to prove that they (1) lacked probable cause; and (2) instigated Shelton's arrest.

### 1. *Applicable Law*

"Although a private citizen may be liable for directing an arrest that results in a false imprisonment, the law will not generally permit inferring such direction simply from a report of crime made to the authorities." *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 510 (Tex. 2002). "Such an inference is justified when a party provides information in its report that it knows is false." *Id.*

## 2. Discussion – Probable Cause

In the second sub-issue to their second issue, appellants challenge the legal and factual sufficiency of the evidence to prove lack of probable cause by incorporating by reference the arguments they made in support of the second sub-issue to their first issue, which we have overruled based our conclusion that the evidence is legally and factually sufficient to support the jury's finding that appellants lacked probable cause to believe that Shelton was committing criminal trespass by playing golf at the ACC golf course on the morning of October 12, 2004. For the same reasons given in our discussion of appellants' second sub-issue to their first issue, we overrule appellants' second sub-issue to their second issue. *See* TEX. R. APP. P. 47.1.

## 3. Discussion – Instigation of Arrest

In the third sub-issue to their second issue, appellants challenge the legal and factual sufficiency of the evidence to prove that appellants instigated Shelton's arrest. Appellants argue that they did not detain Shelton; it was Officer Rodriguez who detained him. According to appellants, there is no evidence that they requested that Officer Rodriguez arrest Shelton. Appellants argue that their identification of Shelton as the perpetrator of an offense was not sufficient to instigate his arrest.

"In Texas, . . . liability for false imprisonment extends beyond those who willfully participate in detaining the complaining party to those who request or direct the detention." *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 507 (Tex. 2002). "False imprisonment's first element may thus be satisfied by conduct that is intended to cause one to be detained, and in fact causes the detention, even when the actor does not

27

participate in the detention." *Id.* The Texas Supreme Court has "sometimes referred to this causation standard as 'instigation' of the false imprisonment." *Id.*

"When the alleged detention results from an unlawful arrest, to prove instigation a plaintiff must show that the defendant clearly directed or requested the arrest." *Id.* "As the Restatement explains, 'in the case of an arrest, [instigation] is the equivalent, in words or conduct, of 'Officer, arrest that man!''" *Id.* (quoting Restatement (Second) of Torts § 45A, cmt. c). "To hold a third party liable for instigating the detention, then, 'the act of arrest [must be] made by the officer, not of his or her own volition, but to carry out the request of the defendant.'" *Id.* (quoting 32 Am. Jur. 2D False Imprisonment § 41 (1995)).

The uncontroverted evidence is that appellants summoned the police to the ACC golf course and identified Shelton as a criminal trespasser to Officer Rodriguez for the purpose of having Shelton arrested and removed from the golf course, which is what subsequently happened. At trial, Officer Rodriguez testified that he had no discretion to refuse to arrest Shelton once Staples's signed the criminal complaint alleging Shelton was a trespasser. In a written statement made after the detention and arrest, Staples confirmed the sequence of events and appellants' role in instigating Shelton's arrest, stating, "When [Shelton] refused my request to leave and not play golf, we called the police and had him arrested."

We conclude that the test for legal sufficiency is met because "the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *See Keller*, 168 S.W.3d at 827. Specifically, reasonable and fair-minded people could have concluded from the evidence that appellants instigated Shelton's arrest. We

28

further conclude that the test for factual sufficiency is met because the verdict is not contrary to the overwhelming weight of the evidence such that it is clearly wrong and unjust. *See Ellis*, 971 S.W.2d at 406-07. Accordingly, appellants' third sub-issue is overruled.

We have considered the three sub-issues fairly included in appellants' second issue and have overruled each. Accordingly, appellants' second issue is overruled.

## IV. MALICE

In their third issue, which consists of two sub-issues, appellants argue that there is no evidence or insufficient evidence to support an award of exemplary damages.

### A.    Applicable Law

Chapter 41 of the Texas Civil Practice and Remedies Code permits exemplary damages where the plaintiff proves by clear and convincing evidence that harm resulted from "malice." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(2) (West Supp. 2011). "'Malice' means a specific intent by the defendant to cause substantial injury or harm to the claimant." *Id.* § 41.001(7) (West 2008). Malice may be proven by direct or circumstantial evidence. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998).

### B.    Standard of Review

In reviewing the legal sufficiency of evidence to support a finding that must be proved by clear and convincing evidence, an appellate court must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 609 (Tex. 2004) (citing *In re J.F.C.*, 96 S.W.3d

29

256, 266 (Tex. 2002)); *see also Bennett v. Reynolds*, 315 S.W.3d 867, 872 n.1 (Tex. 2010).

### C.     Specific Intent to Cause Substantial Harm

In their first sub-issue, appellants argue that Shelton failed to prove that appellants acted with specific intent to cause Shelton substantial harm.  Specific intent means that the actor desires to cause the consequences of his act, or he believes the consequences are substantially certain to result from it.  *In re Estate of Russell*, 311 S.W.3d 528, 535 (Tex. App.—El Paso 2009, no pet.) (citing *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex. 1985)).

According to appellants, Shelton failed to prove specific intent because there is no evidence that they anticipated that Shelton's arrest for criminal trespass would cause substantial harm.  At most, appellants argue, they intended for Shelton to suffer "a brief detention and some financial burden," but not substantial harm.  The evidence at trial, however, established that appellants acted with the desire to cause Shelton to be arrested, jailed, prosecuted, and fined for the crime of criminal trespass.  The jury found that appellants acted without probable cause.  The jury also found that Shelton (1) suffered physical pain and mental anguish, for which it awarded $200,000; (2) suffered disfigurement, for which it awarded $1,500; and (3) required medical care, for which it awarded $1,980.  Assuming the foregoing is substantial harm, the question is whether the evidence is sufficient to establish that appellants acted with specific intent to cause Shelton to suffer substantial harm.  We conclude that it is not.

In cases involving punitive damages, "evidence contrary to a verdict cannot be disregarded."  *See City of Keller*, 168 S.W.3d at 817.  "This is not to say a reviewing

30

court may credit a losing party's explanations or excuses if jurors could disregard them." *Id.* at 818. "But a reviewing court cannot review whether jurors could reasonably disregard a losing party's explanations or excuses without considering what they were." *Id.*

In this case, appellants argue that the evidence negated the possibility that they acted with specific intent to cause substantial harm. We agree.

First, appellants point to the fact that, before they summoned police to the ACC golf course to arrest Shelton, they and their counsel, Walker, corresponded with Shelton in writing, seeking clarification from Shelton regarding his status with respect to ownership, residence, and use of the ACC amenities. Appellants note that Shelton could have, but did not, provide them with clarification on those issues.

Second, before calling the police to report Shelton as a criminal trespasser, appellants gave Shelton written notice, advising him of their conclusion that he was no longer a member of ACC and therefore had no right to use the golf course or other amenities of ACC. In their written notice, appellants informed Shelton of the legal and factual grounds for their conclusion. Appellants warned Shelton that if he returned to the ACC golf course, he would be reported as a trespasser. Again, Shelton could have, but did not, attempt to dispute the assertions made by appellants in their written notice, except by proceeding to play golf on the ACC golf course.

Third, on the day of his arrest, Shelton refused Staples' request to discuss the matter, proceeding instead to play golf. Appellants did not immediately call the police, as they warned Shelton in their letter, but instead sought to have other members who

31

were present sponsor Shelton as a guest. Only after that attempt failed did appellants resort to calling the police.

Fourth, before the police were called, appellants warned Shelton they were going to call the police. Shelton told Staples he did not care if the police were called and even offered Staples his cell phone to make the call.

Fifth, when Officer Rodriguez arrived, Shelton told the officer, "Please, do give them their show." He told the officer to arrest him if he had a warrant. Officer Rodriguez asked Shelton to leave the golf course, but Shelton refused. Officer Rodriguez testified that he would not have arrested Shelton if he had left the golf course. Officer Rodriguez also testified that he might not have arrested Shelton if he had explained his right to be there.

In our discussion of the first sub-issue in appellant's first issue, we concluded that the evidence is legally and factually sufficient to support the jury's finding that appellants acted without probable cause. Subsequently, in deciding the fifth sub-issue in appellant's first issue, we noted that, for purposes of malicious prosecution, "malice may be inferred from a lack of probable cause." *See Luce*, 26 S.W.3d at 566. This, however, does not hold true for establishing malice for purposes of exemplary damages. As we previously noted, in the former context, "Malice has been defined as ill will or evil motive, or such gross indifference or reckless disregard for the rights of others as to amount to a knowing, unreasonable, wanton, and willful act." *Id.* In the context of exemplary damages, however, malice means "a specific intent by the defendant to cause substantial injury or harm to the claimant." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7). Moreover, in the context of exemplary damages, malice

32

must be proven by clear and convincing evidence, not merely by a preponderance of the evidence. *Sw. Bell Tel. Co.*, 164 S.W.3d at 609.

Applying these standards, we conclude that the foregoing evidence tends to prove that appellants acted with the intent to enforce what they believed to be their valid, albeit tenuous, authority to exclude Shelton from the ACC golf course, which they based on the limited facts known to them, the advice they received from counsel, and their interpretation of the deed to Winter and the declaration, articles, bylaws, and rules and regulations for the ACCOA. The jury disbelieved and rejected appellants' assertion of probable cause in having Shelton arrested for criminal trespass based on the foregoing, and we will not disturb its finding in that regard; however, we are compelled to conclude that the evidence is not legally sufficient to prove that appellants acted with specific intent to cause substantial harm under the much more demanding definition and standard of proof required to establish malice in the context of exemplary damages.

Accordingly, appellants' first sub-issue is sustained.

### D.  Suffered Substantial Harm

In their second sub-issue, appellants argue that the evidence is insufficient to prove Shelton suffered substantial harm. Given our disposition of appellants' first sub-issue, there is no need to address the merits of appellants' second sub-issue. *See* TEX. R. APP. P. 47.1. Accordingly, we dismiss appellants' second sub-issue as moot.

### V. BREACH OF CONTRACT

In their fourth issue, which consists of four sub-issues, appellants argue that (1) question 1 failed to properly submit Shelton's claim for breach of contract and (2) the evidence is insufficient to prove breach of contract.

33

## A.    Jury Charge Error

In their first sub-issue, appellants argue that the trial court erred in submitting Shelton's claim for breach of contract to the jury in broad form.

### 1.  Applicable Law

"[W]hen a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory."  *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000).  "[W]hen a jury bases a finding of liability on a single broad-form question that commingles invalid theories of liability with valid theories, the appellate court is often unable to determine the effect of this error."  *Id.*  "It is essential that the theories submitted be authorized and supported by the law governing the case.  If they are not, the appellate court must, at a minimum, be able to determine whether properly submitted theories constituted the basis of the jury's verdict."  *Id.*

### 2.  Standard of Review

We review a challenge to the trial court's jury charge under an abuse of discretion standard.  *Tex. Dep't of Hum. Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990); *Moss v. Waste Mgmt. of Tex., Inc.*, 305 S.W.3d 76, 81 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *European Crossroads' Shopping Ctr., Ltd. v. Criswell*, 910 S.W.2d 45, 54 (Tex. App.—Dallas 1995, writ denied)).  A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles.  *Tex. Dep't of Hum. Servs.*, 802 S.W.2d at 649; *Moss*, 305 S.W.3d at 81.  A trial court has wide discretion in submitting instructions

and jury questions. *Moss*, 305 S.W.3d at 81 (citing *Howell Crude Oil Co. v. Donna Ref. Partners, Ltd.*, 928 S.W.2d 100, 110 (Tex. App.—Houston [14th Dist.] 1996, writ denied)).

### 3. Discussion

Question 1 of the jury charge asked, "Did ALAMO COUNTRY CLUB fail to comply with the terms of the agreement?" The jury was given the following instruction with respect to the agreement:

> The Agreement between James Shelton and the Alamo Country Club consists of the Declarations of Record Phase III, Lots 252 through 641, First Amendment to the Covenants, Conditions, and Restrictions Applicable to Alamo Country Club Subdivision, City of Alamo, Hidalgo County, Texas, the deeds, the Articles of Incorporation and the Articles of Amendment to the Articles of Incorporation of Alamo Country Club Owners Association.

A trial court errs by submitting to the jury theories of liability that are not legally viable, e.g., liability theories that have not been pled, are not supported by the legally sufficient evidence, or are not supported by operative law. *See* TEX. R. CIV. P. 277 (requiring that the trial court submit issues that are raised by the pleadings and the evidence); *Casteel*, 22 S.W. 3d at 390 (stating that Rule 277 implicitly mandates that the jury be able to base its verdict on legally valid questions and instructions); *see also Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 215 (Tex. 2003) ("[B]road-form submission cannot be used to put before the jury issues that have no basis in the law or the evidence."). Thus, although Rule 277 of the Texas Rules of Civil Procedure requires the trial court to submit broad-form questions whenever feasible, submission of broad-form liability question may be infeasible when the trial court is uncertain about whether particular theories of liability should be submitted. TEX. R. CIV. P. 277; *Casteel*,

35

22 S.W.3d at 390. In that circumstance, judicial economy may favor separate submission of liability theories to prevent the need to re-try the cause of action if the trial court reaches an incorrect decision with regard to which theories of liability should be submitted to the jury. *Casteel*, 22 S.W.3d at 390.

Here, Shelton alleged three breaches: (1) ACCOA hired attorneys and sued Shelton without approval by the membership or the Board; (2) ACCOA failed to give Shelton three written warnings before calling the police; and (3) ACCOA prevented him from using ACC amenities. Appellants argue that broad-form submission prevents them from showing that the jury based their "yes" answer on an invalid or unproven theory.

Although Shelton's live pleading alleged three ways in which appellants breached their agreement with him, our review of the record shows that the jury was asked to consider only one of the three as a basis for awarding damages. Specifically, the jury was asked to decide whether appellants breached their agreement with Shelton by preventing him from using the ACC golf course. This is clear from the charge, which asked the jury to decide whether there was a breach of the agreement and, if so, to decide what sum of money would fairly and reasonably compensate Shelton for "loss of use of property."

> During closing arguments, counsel for Shelton told the jury the following:
>
> Question number one is the question concerning the contract. Did Alamo Country Club fail to comply with the terms of agreement? That is, did they fail to give him the benefits of membership? Did they fail to treat him as a member? Did they breach their agreement with him? And I submit to you the evidence is uncontroverted, that, yes, they breached their agreement to him. Yes, they did not let him play golf. And yes, they did not let him use the common areas. And yes, these were all violations. . . . So I will submit to you the [answer] to question . . . number one is yes.
>
> Counsel for appellants told the jury the following:

36

Let's start with question one . . . . This is the one that asks about whether we failed to comply with an agreement with Mr. Shelton. We didn't even know what Mr. Shelton's status was. That's what this was all about, trying to find out was he an owner? Was he a renter? Was he a guest? Was he a resident? What are they claiming?

And let me just make one brief comment about this business about being a resident and the residence rule. There is a document in evidence that they referred to throughout the case as the residence rule. That document does not say a thing about what a resident can do. It has a definition of a resident, but nowhere does it say a resident can play golf or do anything else. I encourage you to look for that document because it does not say a resident can play golf.

You heard from our witnesses that under some circumstances someone can come in and register as a resident and they can use the facilities but Mr. Shelton would never do that. And, in fact, this question you've got it's tailor made for Mr. Shelton. Because Mr. Shelton concealed material facts from Alamo Country Club. Mr. Shelton had knowledge of those facts. Alamo Country Club did not have knowledge of those facts.

That's why we are in this situation. Because Mr. Shelton has reasons why he thinks he's entitled to play golf but he won't share them with anyone. And just before he is arrested when there is one last chance and [Staples] comes up to him and says, sir, have you seen our letter? Can we sit down and talk about this? Mr. Shelton says, no, I'm going to go play golf. Having seen the letter knowing that means the police are going to be called he still says, no, I'm going to go play golf.

. . .

Now, let's get to the questions that talk about money. The first one asked you for an amount for loss of use of the property. This has to do with those few weeks that Mr. Shelton was not allowed to use the golf course at Alamo Country Club.

From the foregoing it is clear that the only theory the jury was asked to decide was whether appellants breached their agreement with Shelton by preventing him from using the ACC facilities and specifically the golf course. The award of damages on Shelton's breach of contract claim in the amount of $500 was based on "loss use of property," which is consistent with only one theory of breach of contract being submitted

37

to the jury. Therefore, the trial court did not submit Shelton's breach of contract claim to the jury in broad form, as appellants argue. Accordingly, appellants' first sub-issue is overruled.

## B.      Sufficiency of the Evidence

### 1.  Approval of Suit Against Shelton

In their second sub-issue, appellants argue that the evidence is insufficient to establish breach of contract because the Declarations and Articles did not require either the membership or board to approve filing suit or hiring the attorneys. In relevant part, Shelton's live petition alleged the following:

> [Shelton] would show that ACC brought this lawsuit without a majority vote of its membership in support of a lawsuit or majority vote of its board of directors in violation of its Articles of Incorporation and amendments, and its Bylaws and amendments, and [Shelton] sues for resulting damages, including, but not limited to loss of use of Alamo Country Club facilities, wrongful arrest damages, and attorney's fees, and for enforcement of the Articles of Incorporation and amendments.

> [Shelton] references ACC's Article 2(c) which states:

>> To make and perform contracts of every kind for any lawful purpose within limits as to amount, determined by a majority of the members of the corporation, with any person, firm, association, corporation, municipality, state, government, or municipal or political subdivision.

> There was no membership vote to hire or contract with attorney(s) to represent ACC to sue [Shelton]. There was no membership vote to sue [Shelton]. There was no board of directors vote to sue [Shelton].

As set forth above in our discussion of appellants' first sub-issue, we have concluded that this theory of liability, though alleged in Shelton's live pleading, was ultimately not submitted to the jury. The jury's award of damages on Shelton's breach of contract claim was for "loss use of property," not for failure to secure approval for the

38

lawsuit against Shelton by a vote of the board or by a vote of the membership. Accordingly, appellants' second sub-issue is overruled.

### 2. Three Written Warnings

In their third sub-issue, appellants argue that the evidence is legally and factually insufficient to support the jury's verdict on Shelton's claim for breach of contract because the Declarations and Articles did not require ACCOA to give Shelton three written notices of violations before calling the police.

In relevant part, Shelton's live petition alleged the following:

ACC's rules and regulations set forth a specific procedure it must follow when it comes to enforcing the restrictions and conditions of ACC. This procedure includes the application of penalties for violations of ACC's governing rules and regulations. Specifically, the rules and regulations outline a three-step process in applying penalities. These are:

1. VIOLATION, 1st OFFENSE
   Violator will be advised by the manager, in writing, of the infraction.

2. VIOLATION, 2nd OFFENSE
   Violator will be advised, in writing, by the manager and violator will be suspended from use of all amenities for a period of two weeks from date of written advisement. In addition, the violator's name will be posted on the club bulletin board and published in the Chatterbox.

3. VIOLATION, 3rd OFFENSE
   Violator will be advised, in writing, by the manager and violator will be suspended from use of all amenities for 30 days from the date of written advisement. In addition, the violator's name be posted on the club bulletin board and published in the Chatterbox, with possible legal action to follow.

ACC did not follow its own three-step process and instead had [Shelton] arrested and filed suit against him to enjoin him from using Alamo Country Club facilities.

Again, as set forth above in our discussion of appellants' first sub-issue, we have concluded that this theory of liability, though alleged in Shelton's live pleading, was ultimately not submitted to the jury. The jury's award of damages on Shelton's breach of contract claim was for "loss use of property," not for failure to give Shelton three written warnings before calling the police or filing suit. Accordingly, appellants' third sub-issue is overruled.

### 3. Use of ACC Amenities

In their fourth sub-issue, appellants argue that the evidence is legally and factually insufficient to support the jury's finding of breach of contract because the declarations and articles of incorporation do not give owners the right to use any of the common areas of the ACC, such as the golf course. At trial, the uncontroverted evidence established that the ACC amenities, such as the golf course, are owned and maintained by ACCOA for the benefit of ACCOA members. There was also uncontroverted evidence that defined ACCOA members to include all persons who acquire title, legal or equitable, to any lot in the subdivision. Finally, the uncontroverted evidence established that Shelton and his wife acquired title to lot #260 in 1995, whereby they became ACCOA members with the right to use ACC amenities.

At trial, appellants maintained that Shelton was divested of his status as an ACCOA member in February 1998, when he signed a warranty deed, purporting to convey lot #260 to Winter for $93,000. Although Shelton included a reservation in the deed stating that the conveyance did "not include the voting rights or the common ground rights or values," appellants argued that the reservation was invalid and void. Appellants also argued that, although Shelton's wife did not sign the deed, the

40

conveyance was nonetheless valid at least as to Shelton's one-half interest in the community property, thus stripping Shelton of his membership in the ACCOA even though his wife remained a member.

Shelton took the position that the deed was void and of no effect because he and his wife acquired lot #260 together, as husband and wife, and the property was therefore acquired as community property, which could only be conveyed by a deed signed by both spouses. In support of this, he offered expert testimony from attorney John King. Additionally, an expert report from King evaluating the validity of the deed from Shelton to Winter was admitted into evidence. In the report, King opined, in relevant part, as follows:

> Mr. Shelton's attempted conveyance to Mr. Winter under Dalton would have been invalid as an illegal partition of community property. See Dalton v. Jackson, 691 S.W.2d 765, 768 (Tex. App.—Austin 1985, no writ) (one spouse may not convey to a third party, so as to effectuate a partition by creating a tenancy-in-common between the remaining spouse and the third party); see also Tex. Fam. Code Ann. § 3.102(c) (Vernon 2005).

> Under Vallone, one spouse cannot alone convey or encumber joint management community property unless spouses have otherwise agreed. Vallone v. Miller, 663 S.W.2d 97, 99 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.). No power of attorney in writing or other agreement has been provided to me showing that Mrs. Shelton agreed to the attempted conveyance.

> Standard 14.60 of the Texas Title Examination Standards states that if property is acquired during marriage by a deed naming both spouses as grantees, an examiner may not give effect to a subsequent conveyance of the property unless (1) it is joined by both spouses or (2) it was made by the husband before January 1, 1968, and did not convey homestead property.

> The pleadings I have reviewed indicated that Mr. Shelton was arrested on Alamo Country Club premises on October 12, 2004 while playing golf. It is my opinion that Mr. Shelton had a legal right to be on the premises of the Alamo Country Club at the time of his arrest for criminal trespass.

41

We agree with the conclusions reached in King's report. Appellants argue that the deed to Winter was valid at least as to Shelton's interest in the property, thus creating a tenancy-in-common between Winter and Shelton's wife. The Austin Court of Appeals rejected that position in its decision in *Dalton*, where the court held that "one spouse may not convey his or her interest in joint community property to a third party, so as to effectuate a partition by creating a tenancy-in-common between the remaining spouse and the third party." *Dalton v. Don J. Jackson, Inc.*, 691 S.W.2d 765, 768 (Tex. App.—Austin 1985, no writ). We reach the same conclusion, noting that this result preserves the character of the property, which was acquired by Shelton and his wife as community property. *See Carter v. Carter*, 736 S.W.2d 775, 780 (Tex. App.—Houston [14th Dist.] 1987, no writ) ("The separate or community nature of property is determined by the time and circumstances of its acquisition.").

Although appellants are correct in noting that a spouse may change community property into separate property, we have recognized this only when a spouse gifts or conveys his interest in community property to his spouse as her separate property. *Pankhurst v. Weitinger & Tucker*, 850 S.W.2d 726, 730 (Tex. App.—Corpus Christi 1993, writ denied) ("A gift by the husband to the wife of his interest in community property would become the separate property of the donee [spouse].") (citing *Hilley v. Hilley*, 342 S.W.2d 565, 568 (Tex. 1961)). That is not what took place in this case, as the conveyance at issue purported to be from one spouse to a third party, not from one spouse to another.

Finally, appellants cite *Vallone v. Miller*, 663 S.W.2d 97, 99 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.) in support of their contention that "other courts have

concluded a spouse may convey his undivided half interest to a third party without the spouse's consent, resulting in a co-tenancy." We conclude that *Vallone* does not support their position.

In *Vallone*, which was an appeal from a take-nothing judgment on appellant's suit seeking specific performance of a contract to convey real property, the court was presented with "a completed written agreement to convey property [that] had been executed by appellant as purchaser and appellee [husband] as seller." *Id.* at 97-98. The court noted that in the blank for the name of the "sellers" were the names of both the husband and his wife, but only the husband signed the agreement. *Id.* at 98. The husband and wife "contended that the property was joint management community property which could not be conveyed or encumbered by one spouse alone; and asserted the contract was incomplete on its face and it had no force or effect because [the wife's] signature did not appear on the document." *Id.* After a jury found "that the property was joint management community property, the trial judge entered [a take nothing] judgment in favor of [husband and wife]." *Id.*

On appeal, the court noted that "[i]t is clear that a husband has the right to convey his one-half interest in non-homestead joint management community property without the signature of his wife on the conveyance." *Id.* Then, the court explained:

> The earnest money contract is incomplete on its face and is not capable of being enforced by specific performance. While both husband and wife are named as sellers only the husband's signature appears on the contract. The description of the property to be sold is not in terms of the husband's "undivided one-half interest" or other words to indicate that only [the husband's] interest was involved. From the terms of the document it is evident the parties intended that the agreement would be effective only upon execution by both [husband] and [wife] as sellers. Once there was the proper execution, the contract was to involve the interests of both [husband and wife].

43

*Id.*

Similarly, in this case, the deed to Winter was not stated in terms of Shelton's "undivided one-half interest" or other words to indicate that only Shelton's interest was involved. On the contrary, from the terms of the deed, it appears that the conveyance purported to involve the interests of both Shelton and his wife, though only Shelton's signature appears on the document.

In *Vallone*, the court was faced with the same question presented in this case: "whether the signature of one spouse was binding upon both husband and wife." *Id.* at 99. The court noted that "[o]ne spouse cannot alone convey or encumber joint management community property unless the spouses have otherwise agreed." *Id.* The court concluded "[w]ithout a 'power of attorney in writing or other agreement' to the contrary, [the husband] had no authority to contract to dispose of the entire joint management community property without his wife joining in the contract." *Id.* We reach the same conclusion. There was no evidence offered at trial of a power of attorney or other written agreement between Shelton and his wife authorizing Shelton to dispose of lot #260 to Winter, as set forth in the deed. Accordingly, we conclude that the deed was void.

The evidence was legally and factually sufficient to establish that, at all relevant times, Shelton and his wife were members of the ACCOA, had the right to use ACC amenities, including the ACC golf course, and that appellants deprived Shelton of his right to use the ACC amenities by having him arrested on the golf course for criminal trespass. Accordingly, appellants' fourth sub-issue is overruled.

44

We have considered the four sub-issues fairly included in appellants' fourth issue and have overruled each. Accordingly, appellants' fourth issue is overruled.

## VI. ATTORNEY'S FEES

In their fifth issue, which consists of three sub-issues, appellants argue that there is no evidence or insufficient evidence to support the jury's award of $95,000 for reasonable and necessary attorney's fees.

### A. Conclusory Opinion Testimony

In their first sub-issue, appellants argue that the evidence is legally and factually insufficient to support an award of attorney's fees in the amount of $95,000 because the only evidence is the testimony by Shelton's attorney, Katie Klein, who gave a conclusory opinion on the total fee for the entire case and the client ledger for Shelton's file, which did not document who worked on the file or what they did.

Klein testified that she was licensed 31 years ago and is board certified in civil trial law and family law. Her resume was admitted into evidence. Two other lawyers in Klein's firm also represented Shelton in this matter. They have been practicing for close to 20 years and over 25 years, respectively. Klein charged Shelton a contractual hourly rate of $150, which, Klein testified, is below her normal rate of $325. According to Klein, anything in the $300 hourly range would be reasonable in the community. Klein charged Shelton an hourly rate of $60 for legal assistants. According to Klein, a reasonable hourly rate for legal assistants in Hidalgo County is between $50 and $85.

Klein testified that she had performed legal work for Shelton in this matter for five years leading up to trial. Her firm defended Shelton against ACCOA's claims and

45

prosecuted his claims against appellants for breach of contract, malicious prosecution, false imprisonment, intentional infliction of emotional distress, and civil conspiracy.

Klein's client ledger for Shelton was admitted into evidence. It showed the total hours worked by the attorneys and legal assistants. For the period through December 13, 2009, the ledger showed that total fees were $87,313.64, of which $68,533.84 had been paid. Unbilled fees were $18,799.80. Klein estimated that attorney's fees for trial would be $3,000 per day. That brought the total to approximately $100,000 through verdict.

According to Klein, "All of the facts having to do with the breach of the covenants and having to do with the contract claims have the same facts that have to do with the tort claims." In Klein's opinion, "to prove one you have to prove them all." According to Klein, this was also true of the defense of the claims brought by ACCOA: "his defense is that he had a contractual right to be where he was and to do what he was doing." On cross examination, Klein testified that she did not believe it was possible to segregate the tort claims and the claim for attorneys' fees relating to breach of contract. According to Klein, they are inextricably intertwined and cannot be separated. She testified, "I believe that they cannot be separated because they're all the same issues of his right to be there [on the golf course], his being a resident, his being arrested, and his being mistreated by the country club. I don't think you can separate them." Klein was later re-called as a witness, and she testified that, after reviewing invoices for Shelton's case, she had determined that approximately 5% of the fees were related solely to the tort claims.

Appellants did not offer any evidence to controvert Klein's testimony or the client ledger.

### 1. Applicable Law

Generally, the party seeking to recover attorney's fees carries the burden of proof. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991). "A reasonable fee is one that is not excessive or extreme, but rather moderate or fair." *Garcia v. Gomez*, 319 S.W.3d 638, 642 (Tex. 2010). The reasonableness of attorney's fees is ordinarily left to the fact-finder, and a reviewing court may not substitute its judgment for the jury's. *Barker v. Eckman*, 213 S.W.3d 306, 314 (Tex. 2006).

### 2. Discussion

Appellants argue that the evidence is legally and factually insufficient to support the jury's award of attorney's fees in the amount of $95,000 because Klein's testimony was conclusory. Specifically, appellants complain that Klein "did not describe any specific tasks, when they were done, who did them, or how they supported the contract claim."

"An attorney's testimony about the reasonableness of his or her own fees is not like other expert witness testimony." *Garcia v. Gomez*, 319 S.W.3d 638, 641 (Tex. 2010). "Although rooted in the attorney's experience and expertise, it also consists of the attorney's personal knowledge about the underlying work and its particular value to the client." *Id.* According to the Texas Supreme Court, "The testimony is similar to that of a property owner whose personal knowledge qualifies him to give an opinion about his own property's value." *Id.* (citing *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 874 (Tex. 2009); *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex.

47

2002)). "The attorney's testimony is not objectionable as merely conclusory because the opposing party, or that party's attorney, likewise has some knowledge of the time and effort involved and if the matter is truly in dispute, may effectively question the attorney regarding the reasonableness of his fee." *Id.* "[W]here the testimony of an interested witness is not contradicted by any other witness, or attendant circumstances, and the same is clear, direct and positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it is taken as true, as a matter of law." *Id.* at 642.

In this case, the award of attorney's fees was not based merely on a conclusory statement that a $95,000 fee was reasonable, as appellants suggest. The evidence established an hourly rate of $150, which went uncontested as a reasonable hourly rate for the attorneys representing Shelton based on their professional experience, qualifications, and reputations in the community. The 35-page client ledger established the number of hours worked on Shelton's case and when those hours were worked. There was no dispute as to the authenticity of the ledger as a business record or to the accuracy of the information it contained. Thus, the ledger provided a non-conclusory and reliable basis for establishing the amount of time the attorneys spent working on Shelton's case.

To the extent that appellants contend that Shelton was required to put on specific evidence concerning each individual task performed by his attorneys during the course of their 5-year representation, as well as testimony to establish exactly why each individual task was reasonable and necessary, their contention is made without appropriate citation to supporting authority. *See* Tex. R. App. P. 38.1(i). There was no

48

dispute at trial about the actual number of hours Shelton's attorneys spent performing necessary services or the reasonableness of the hourly rate charged. *See Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 580 (Tex. 2012) ("[A] reasonable hourly rate multiplied by the number of hours spent performing necessary services within the guardian ad litem's role yields a reasonable fee."). The only contested issue was whether it was possible to segregate the services rendered to establish the total number of hours spent performing services relating solely to Shelton's tort claims. Klein testified that it was 5%. We note that in their third sub-issue, appellants have made a separate challenge to the sufficiency of the evidence on the issue of segregation of attorney's fees. Accordingly, we will address that contention in connection with appellants' third sub-issue.

We conclude that the test for legal sufficiency is met because "the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *See Keller*, 168 S.W.3d at 827. Specifically, reasonable and fair-minded people could have concluded from the evidence that $95,000 was a reasonable amount for attorney's fees. We further conclude that the test for factual sufficiency is met because the verdict is not contrary to the overwhelming weight of the evidence such that it is clearly wrong and unjust. *See Ellis*, 971 S.W.2d at 406-07. Accordingly, appellants' first sub-issue is overruled.

**B.     Per Se Unreasonable**

In their second sub-issue, appellants argue that under any rational standard, $95,000 is not a reasonable fee to collect $500. Appellants argue that "[t]he jury must

49

consider the amount involved and the result obtained; the degree of success on the contract claim is the most critical factor on what fee is reasonable."

In this case, the jury charge asked the jury to decide what amount would be "a reasonable fee for the necessary services of [Shelton's] attorneys in this case." The jury was instructed "to consider attorney's fees necessary for James Shelton's claim for breach of agreement only and not attorney's fees incurred in connection with any other claims." The jury was not instructed that it "must consider the amount involved and the result obtained," as appellants argue. Nor was the jury instructed that "the degree of success on the contract claim is the most critical factor on what fee is reasonable," as appellants contend. Moreover, appellants did not object to this portion of the charge or request that the jury be given either of those instructions.

Our mandate is to review the sufficiency of the evidence based on the charge actually submitted. *Barker v. Eckman*, 213 S.W.3d 306, 313 (Tex. 2006) (citing *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001) ("[A]n appellate court is to review the evidence according to the jury charge given and the jury findings in response to that charge.")). We have already reviewed sufficiency of the evidence in connection with appellants' first sub-issue and concluded that it was both legally and factually sufficient to support the award of $95,000 in attorney's fees. Appellants' second sub-issue presents nothing further for the Court to review. Accordingly, appellants' second sub-issue is overruled.

## C.    Segregation

In their third sub-issue, appellants argue that the evidence is legally and factually insufficient to support the jury's award of attorney's fees because Shelton failed to prove what services advanced both the contract and tort claims.

"[T]he need to segregate fees is a question of law." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 312 (Tex. 2006).   The courts of appeals have generally (though not always) applied a de novo standard of review.   *Id.*   Nonetheless, "it may often be impossible to state as a matter of law the extent to which certain claims can or cannot be segregated; the issue is more a mixed question of law and fact for the jury." *Id.*

As noted above, Klein initially testified that the services could not be segregated and then later testified that she had determined that 5% of the services were related solely to the tort claims.   This is precisely the type of testimony courts have required in other cases involving similar issues.   *See Flagship Hotel, Ltd. v. City of Galveston*, 117 S.W.3d 552, 566 n.7 (Tex. App.—Texarkana 2003, pet. denied) ("Flagship argues that the segregation standard is difficult to meet.   We disagree and note that segregated attorney's fees can be established with evidence of unsegregated attorney's fees and a rough percent of the amount attributable to the breach of contract claim."); *see also Tony Gullo Motors*, 212 S.W.3d at 314 ("Here, Chapa's attorneys did not have to keep separate time records when they drafted the fraud, contract, or DTPA paragraphs of her petition; an opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim."); *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex. 1997) (noting that claimant's

attorney "testified that approximately twenty-percent of his time and fifteen-percent of his paralegal's time concerned issues predating the agreed judgment"); *Med. Specialist Group, P.A. v. Radiology Assocs., L.L.P.*, 171 S.W.3d 727, 738 (Tex. App.—Corpus Christi 2005, pet. denied) ("In his affidavit, Radiology Associates' counsel. . . testified that his fees for the defense of the case totaled $460,087.00, and approximately forty percent of these fees were directly related to Saratoga's antitrust claims."). Appellants' third sub-issue is overruled.

We have considered the three sub-issues fairly included in appellants' fifth issue and have overruled each. Accordingly, appellants' fifth issue is overruled.

## VII. ACTUAL DAMAGES

In their sixth issue, which consists of three sub-issues, appellants argue that there is insufficient evidence to support the jury's award of actual damages.

### A. Damages for Breach of Contract

In their first sub-issue, appellants argue that the evidence is insufficient to establish that Shelton suffered $500 loss of use damages from any breach of contract.

The jury heard uncontroverted evidence that Shelton was barred from using ACC amenities from October 12, 2004 through November 8, 2004. Shelton testified that he regularly played golf at ACC and would play three rounds per day. There was testimony that the fee for a non-member to play on the ACC golf course as a guest was $8. From this evidence, the jury could have found that Shelton was deprived of using the golf course for 27 days, the lost use of the golf course was worth $24 per day, and Shelton's total loss was $648 for the entire period. On this record, the jury's award of $500 for

52

Shelton's lost use of the facilities is just compensation for which the evidence is legally and factually sufficient. *See Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882, 888 (Tex. App.—Dallas 2004, pet. denied) ("The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained."). Accordingly, appellants' first sub-issue is overruled.

## B.  Damages for Pain, Suffering, Mental Anguish

In their second sub-issue, appellants argue that the evidence is insufficient to establish that malicious prosecution or false imprisonment caused Shelton pain, suffering, and mental anguish to support a jury award of $200,000.

Mental anguish damages cannot be awarded without either "direct evidence of the nature, duration, or severity of [plaintiff's] anguish, thus establishing a substantial disruption in the plaintiff's daily routine," or other evidence of "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). Compensation can only be for mental anguish that causes "substantial disruption in daily routine" or "a high degree of mental pain and distress." *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). Courts should "closely scrutinize" awards of mental anguish damages. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 (Tex. 1997). There must also be evidence that the amount of mental anguish damages awarded is fair and reasonable, and the appellate court must perform a "meaningful evidentiary review" of the amount found. *Saenz*, 925 S.W.2d at 614.

In *Saenz*, which appellants cite in support of their argument, the Texas Supreme Court held that the plaintiff's testimony—"I worried about that lot"—was an insufficient

53

basis for awarding mental anguish damages because it did not establish a "substantial disruption in daily routine" or "a high degree of mental pain and distress." *Id.* In this case, in contrast, there was direct evidence of the nature, duration, and severity of Shelton's mental anguish, establishing that there was a substantial disruption in his daily routine. As noted above, Shelton is an avid golfer, who played up to three times a day on the ACC golf course prior to his arrest. He testified that he enjoyed playing golf and did it for the exercise. The arrest struck at the core of Shelton's day-to-day routine, affecting his lifestyle and his means of maintaining physical health and emotional well-being.

Shelton testified that "it is by far the most stressful event that ever took place in my life, and I thought that I always worked under high stress circumstances for every employment job I had." Being handcuffed was a "big emotional" event. He was publicly humiliated by being arrested in front of 15 of his neighbors. He felt hurt. He felt that he had been placed in jeopardy and his pulse went up and he had difficulty calming down. According to his wife, Shelton remained in a state of disbelief after his release from jail. He did not sleep well at night. He would wake up clenching his jaw. The back of his mouth hurt from grinding his teeth. Clumps of his hair started falling out. He lost approximately 20% of his hair following the arrest. He attributed the teeth-grinding and hair loss to stress caused by the arrest.

Appellants argue that expert testimony is necessary to establish that Shelton's emotional distress caused his teeth-grinding and hair loss; however, other courts have permitted lay testimony on similar issues and we are not persuaded that this is an area reserved exclusively for expert witness testimony. *See, e.g., Toles v. Toles*, 45 S.W.3d

54

252, 263 (Tex. App.—Dallas 2001, pet. denied) ("According to Wife, she suffered from an ulcer, and Husband's treatment of her caused her great emotional distress, caused her to feel worthless and ashamed, and caused her to grind her teeth so hard that some are cracked.").

Shelton's social life and family life were also disrupted. He believed he "had better just lay back from this and just be quiet." He quit attending board meetings. He completely withdrew from activities at ACC other than playing golf. He quit playing in the men's golf league. He quit attending social dinners at ACC. Shelton's wife testified that they were no longer welcome at ACC, which affected both of them.

Shelton also testified that the arrest itself was physically painful. He felt discomfort when his hands were handcuffed. According to Shelton, the handcuffs were put on very tightly and he suffered bruising around the wrists that lasted six weeks.

We conclude that this is evidence of mental pain and distress that was more than mere worry, anxiety, vexation, embarrassment, or anger. *See Goodman v. Page*, 984 S.W.2d 299, 306-07 (Tex. App.—Fort Worth 1998, pet. denied) (holding that testimony regarding stomach problems, harm to reputation, public and private humiliation, being devastated, feeling betrayed, and subjection to derogatory comments constituted high degree of mental pain and distress); *see also Latham v. Castillo*, 972 S.W.2d 66, 70 (Tex. 1998) (plaintiffs' testimony that conduct "made me throw up . . . sick, nervous, mad," "hurt me a lot," and "my heart was broken. I was devastated, I felt physically ill" held "some evidence that conduct caused a high degree of mental pain and distress").

Accordingly, appellants' second sub-issue is overruled.

**C.    Damages for Disfigurement**

In their third sub-issue, appellants argue that the evidence is insufficient to establish that Shelton suffered any disfigurement and the award of damages in the amount of $1,500 for disfigurement was excessive.  According to appellants, the hair loss and dental problems suffered by Shelton are simply not disfiguration.  As appellants note in their brief, the Texas Supreme Court has observed that "[d]isfigurement has been defined as that which impairs or injures the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Goldman v. Torres*, 341 S.W.2d 154, 160 (Tex. 1960).  As Shelton points out, this Court has previously upheld a $500,000 award for disfigurement caused by the loss of two front teeth.  *See Pentes Design, Inc. v. Perez*, 840 S.W.2d 75, 81 (Tex. App.—Corpus Christi 1992, writ denied).  We disagree with appellants' assertion that the hair loss and dental problems suffered by Shelton are categorically outside the scope of a legally-compensable injury.  The jury's award of $1,500 in damages was "within the discretion of the fact finder."  *See id.* at 80.  The amount of damages is "not excessive."  *See id*. at 81.  We conclude that the evidence is legally and factually sufficient to support the award.  Accordingly, appellants' third sub-issue is overruled.

We have considered the three sub-issues fairly included in appellants' sixth issue and have overruled each.  Accordingly, appellants' sixth issue is overruled.

### VIII. PUNITIVE DAMAGES

In their seventh issue, appellants argue that the jury's award of punitive damages is excessive and violates due process.  As set forth above in our discussion of

appellants' third issue, we have concluded that the evidence is legally insufficient to support an award of exemplary damages based on the jury's finding of malice. Accordingly, it is unnecessary to decide appellants' seventh issue pertaining to the size of the award. *See* TEX. R. APP. P. 47.1.

## IX. CROSS-ISSUE

In his cross-issue, Shelton argues that the trial court erred in modifying its February 23, 2010 judgment and entering its May 24, 2010 modified final judgment in reducing the $500,000 award in punitive damages against ACCOA to $201,500 to conform to the punitive damages cap. Having sustained appellants' third issue challenging the sufficiency of the evidence to support the jury's finding of malice, the only basis for its award of exemplary damages, we vacate the award in its entirety and overrule Shelton's cross issue.

## X. CONCLUSION

We reverse the trial court's award of $201,500 in exemplary damages, render judgment that Shelton take nothing by way of his claim for exemplary damages, and affirm the remainder of the judgment.

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
31st day of August, 2012.